IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

CRAIG J. MYERS, )
)
      Plaintiff, )
)
vs. ) Civil No. 12-cv-894-WDS-CJP
)
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security, )
)
      Defendant.[1] )

## REPORT and RECOMMENDATION

**PROUD, Magistrate Judge:**

This Report and Recommendation is respectfully submitted to District Judge William D. Stiehl pursuant to 28 U.S.C. § 636(b)(1)(B).

In accordance with 42 U.S.C. § 405(g), plaintiff Craig J. Myers seeks judicial review of the final agency decision denying him Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Mr. Myers applied for benefits in June, 2009, alleging disability beginning on February 2, 2009. (Tr. 11). After holding an evidentiary hearing, ALJ George Gaffaney denied the application for benefits on April 21, 2011. (Tr. 11-20). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this

---

[1] Carolyn W. Colvin was named Acting Commissioner of Social Security on February 14, 2013. She is automatically substituted as defendant in this case. See Fed. R. Civ. P. 25(d); 42 U.S.C. §405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ failed to include all of plaintiff's limitations in the assessment of his residual functional capacity.

2. The ALJ failed to properly evaluate plaintiff's credibility.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** However, "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

contributing factor material to the Commissioner's determination that the individual is disabled."  **42 U.S.C. §423(d)(2)(C).**

"Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, **649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **20**

**C.F.R. §§ 404.1520;** *Simila v. Astrue***, 573 F.3d 503, 512-513 (7th Cir. 2009);** *Schroeter v. Sullivan***, 977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler***, 737 F.2d 714, 715 (7th Cir. 1984).** *See also Zurawski v. Halter***, 245 F.3d 881, 886 (7th Cir. 2001**)(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether Mr. Myers was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. **See,** *Books v. Chater***, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing *Diaz v. Chater***, 55 F.3d 300, 306 (7th Cir. 1995)**). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, **103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, **597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Gaffaney followed the five-step analytical framework described above. He determined that Mr. Myers had not been engaged in substantial gainful activity since the date of his application. He noted that Mr. Myers had initially alleged disability due to depression and aggression. However, after the initial denial, he alleged physical problems as well, consisting of leg and back pain. The ALJ found that plaintiff had severe impairments of depression, personality disorder, and osteoarthritis of the knees and lumbar spine. He further determined that his impairments do not meet or equal a listed impairment.

The ALJ found that Mr. Myers had the residual functional capacity to perform work at the light exertional level, limited to only occasional climbing of ladders and to work involving only simple, routine, unskilled tasks with only occasional changes in routine work setting. Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do his past relevant work. However, he could do other jobs

that exist in significant numbers in the economy, and so was not disabled.

**The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Report and Recommendation. The following summary of the record is directed to the points raised by plaintiff.

1.  **Agency Forms**

Plaintiff was born in 1957, and was almost 52 years old on the alleged onset date of February 2, 2009. He was insured for DIB through December 31, 2012. (Tr. 165).

In his initial Disability Report, submitted in June, 2009, plaintiff said that he was unable to work due to anger management problems and depression. He said that he got angry quickly, and was depressed and cried. He said he stopped working in February, 2009, because he was getting paranoid and started hearing things. (Tr. 169).

Mr. Myers said he had worked as a construction laborer from 1994 to 2009. He also did maintenance work at a nursing home in 2006 and 2007. (Tr. 170).

Plaintiff filled out an Activities of Daily Living Questionnaire in August, 2009. The form asked him to check off the items affected by his condition. He checked only "getting along with others." He did not check off items such as sitting, standing, walking, lifting, concentration, completing tasks or following instructions. (Tr. 182). He did not check the box to indicate that he used a cane. (Tr. 183).

On September 17, 2009, the agency notified plaintiff that his claim was denied. He then filed a request for reconsideration in which he said he had depression, bipolar, anxiety, HTN, diabetes, schizophrenia, back pain, leg pain and asthma. The document

was dated October 5, 2009. (Tr. 51).

Plaintiff completed another Activities of Daily Living Questionnaire in November, 2009. This time, he checked the boxes indicating that he had trouble with lifting, squatting, bending, standing, walking, sitting, stair climbing, seeing, memory, completing tasks and getting along with others. He did not indicate that he had problems with concentration, understanding or following instructions. (Tr. 211). He did not claim to use a cane. (Tr. 212).

The agency scheduled a consultative physical examination, but plaintiff failed to attend. (Tr. 55, 393).

### 2. Evidentiary Hearing

Mr. Myers was represented by an attorney at the evidentiary hearing on March, 2011. (Tr. 27).

Plaintiff had a cane at the hearing. He said that he had been using it for almost a year. He got it at the VA hospital. He said he needed a cane because he had "a disc." He said he had "severe arthritis" in his knees and his back, and that his left leg went numb on him. (Tr. 28).

Plaintiff testified that he was 5' 9½" tall and weighed 184 pounds. (Tr. 29). He lived in a shelter for homeless veterans. He last worked for Labor Ready 3 or 4 years earlier. He said he was unable to work because he could not stand or sit for long, and his left leg went numb after walking for half a block. He had been having "that much trouble" for the past 2 to 3 years. (Tr. 30).

He had a substance abuse problem, but had graduated from a rehabilitation

program in January, 2011, and had been sober since then. His psychological problems remained the same after completing the rehab program. He heard things and felt that people were following him. He slept a lot during the day and cried sometimes. He avoided people. When not sleeping, he spent about 3 or 4 hours a day in a reclined position because of back pain. (Tr. 29, 31-33).

Plaintiff had been hospitalized a number of times for depression, but he admitted that all those instances involved too much drinking, as well. (Tr. 34).

A vocational expert (VE) also testified. The ALJ asked the VE to assume a person who was able to lift 10 pounds frequently and 20 pounds occasionally, and sit, stand and walk each for 6 out of 8 hours. He was limited to only occasional climbing of ladders. Further, he was limited to simple, routine tasks with just occasional changes in a routine work setting. The VE testified that this person could not do Mr. Myers' past work. However, he could perform other jobs such as food preparation worker, light housekeeping and packer. (Tr. 36-37).

### 3. Medical Treatment

Plaintiff had a number of psychiatric hospitalizations before he stopped drinking in January, 2011. He was admitted to John Cochran VA Medical Center in St. Louis, Missouri, on September 21, 2008. He had lost his job a few weeks earlier and was unable to find another job. His girlfriend was nagging him to find a job or move out. He was depressed and had begun drinking again after two years of sobriety. Despite a high blood alcohol level on admission, he downplayed his drinking and denied that he had a problem. (Tr. 1088 -1089). He was hospitalized at St. Anthony's Medical Center

in St. Louis, Missouri, in December, 2008, for major depression, alcohol abuse and history of substance abuse. He had used cocaine for 25 years. He was placed on a detox protocol. The physical examination was "within normal limits." (Tr. 270). He was hospitalized at St. Elizabeth's Hospital in Belleville, Illinois, in May, 2009, with diagnoses of major depressive disorder, alcohol abuse, marijuana abuse in remission and cocaine abuse in remission. His blood alcohol level was .22 on admission. It appeared that his hospitalization was precipitated by a fight with his girlfriend which was intensified by his drinking. After a few days in the hospital, he rated his depression as minimal. He recognized that "his drinking was problematic and played a larger role in his admission." (Tr. 339-340).

He was readmitted to St. Elizabeth's in July, 2009, with reported suicidal ideation. His blood alcohol on admission was .357, but he claimed to have had only 2 shots and a beer. He said he did not remember making suicidal threats. The doctor felt that his symptoms were "substance induced," as his depression subsided within a day or two in the hospital, which "is not consistent with a major depression." The doctor also wrote that he was motivated by "secondary gain" concerning his application for social security benefits. (Tr. 325-326). During another hospitalization at St. Elizabeth's in November, 2009, the doctor again noted that his symptoms were substance induced as his depression completely subsided within 2 to 3 days. (Tr. 394-395). He was hospitalized at John Cochran VA Medical Center from November 29, 2009, to December 1, 2009. He said he was depressed. He had again been drinking. He was ambulatory and had a normal gait. At discharge, he was not depressed. (Tr. 1083-1087).

This pattern continued in 2010. In June, 2010, plaintiff was hospitalized at John Cochran VA Medical Center with a diagnosis of depressive disorder, not otherwise specified. He had recently been discharged from a psychiatric hospitalization in Illinois, and again had conflict with his fiancée. He had relapsed on alcohol after a period of sobriety. His physical examination, including his gait, was normal. On discharge, his memory, mood, thought process, concentration, and orientation were all normal. (Tr. 468–473).

Mr. Myers was taken to the emergency room in July, 2010, after threatening suicide. He was intoxicated. (Tr. 412-413).

He was again admitted to John Cochran on November 16, 2010, with diagnoses of major depressive disorder, moderate, and alcohol abuse. He was admitted from another hospital. His girlfriend's ex-boyfriend had hit him in the head with a bottle. He had stitches in his forehead. He was homeless. He was depressed. He had not seen his psychiatrist or taken medication since the summer. On exam, his gait was normal. (Tr. 1068-1071). He was considered for the Substance Abuse Recovery and Rehabilitation Program (SARRTP), but was rejected because he did not have the motivation to stop drinking and wanted to use the program as a shelter. On the day of discharge, December 2, 2010, he was calm and cooperative and denied suicidal or homicidal ideation. (Tr. 1072).

Mr. Myers was admitted to SARRTP at John Cochran on December 27, 2010. He was admitted after an inpatient stay at Jefferson Barracks VA Medical Center. He was discharged after completing the program on January 10, 2011. At discharge, he was

stable on medications and reported an improved mood and fewer symptoms of depression. He was to continue with substance abuse aftercare at SARRTP and was to continue seeing the psychiatrist at John Cochran. (Tr. 1063-1067).

Mr. Myers was seen by a doctor at John Cochran for complaints of back pain and leg swelling in December, 2009. The assessment was osteoarthritis. Plaintiff reported that his pain was relieved by Tylenol. (Tr. 1148-1152). X-rays of the right knee were normal on December 22, 2009. The x-rays showed a lesion in the upper shaft of the fibula. (Tr. 1038). This was evaluated using a bone scan, which showed increased uptake in the shoulders, right knee and L5-S1, consistent with degenerative changes. (Tr. 1035-1036).

On April 14, 2010, Mr. Myers was seen by a gastroenterologist at John Cochran. In the review of systems, he said that he had pain in his knees and that he could not walk more than a block. The doctor noted that he "walks and moves easily throughout the exam." The doctor also noted that plaintiff said he drank a six-pack of beer twice a week, but "breath smells of stale ETOH so suspect higher consumption." (Tr. 1129-1132).

Plaintiff requested a cane from the VA medical center in May, 2010, due to right knee pain and swelling. He had a "noticeable limp." (1124-1125). In June, 2010, x-rays of the right knee showed mild degenerative joint disease and joint effusion. (Tr. 1031-1032). He was scheduled for an orthopedic consult in July, 2010, but failed to appear. (Tr. 1221-1122).

X-rays were taken at John Cochran on January 12, 2011. X-rays of the lumbar spine showed narrowing of the L4-L5 interspace with moderate spurring on the margins

of L4 and L5. There was no evidence of fracture or dislocation. There was mild scoliosis convex to the left. (Tr. 1026). X-rays of the right knee showed no fracture, dislocation or arthritic changes. There was no soft tissue swelling. (Tr. 1027). X-rays of the left hip showed no fracture, dislocation or arthritic change. (Tr. 1028).

On January 18, 2011, a social worker noted that plaintiff had an "altercation with his ladyfriend" and was in jail for about 2 days. He was living in the St. Joseph's Homeless Center and had been abstinent from alcohol for about 30 days. (Tr. 1191).

On January 21, 2011, a vocation rehabilitation specialist at John Cochran met with plaintiff to discuss the work therapy program. Plaintiff was interested in the Transitional Work Experience program. The rehabilitation specialist said that he would be enrolled in the program as soon as the caseload permitted, and requested medical clearance in accordance with the Compensated Work Therapy protocol. (Tr. 1094).[3]

On January, 31, 2011, plaintiff complained to a physician's assistant at John Cochran that he had right knee pain, unchanged from his last visit. He said Naproxen was not working. He had no swelling in his extremities. There was no mention of a cane. He had an orthopedic appointment for March 17, 2011. He was to discontinue Naproxen and to take Meloxicam, a nonsteroidal anti-inflammatory drug, as needed. (Tr. 1183-1187).

The physician's assistant noted that Mr. Myers said that he would have a "hall

---

[3] "Compensated Work Therapy (CWT) is a Department of Veterans Affairs (VA) vocational rehabilitation program that endeavors to match and support work ready veterans in competitive jobs, and to consult with business and industry regarding their specific employment needs." See, www.va.gov/health/cwt, accessed on December 17, 2013.

monitor" job through the Compensated Work Therapy program, which would be described as sedentary. He indicated that plaintiff would be "considered a low risk for this type job." (Tr. 1189).

In January, 2011, plaintiff was given an appointment for an orthopedic consult for his right knee on March 17, 2011. (Tr. 1096). No mention of that appointment was made at the hearing on March 16, 2011, and no record of any such consult was submitted to the ALJ.

Plaintiff was seen by a psychiatrist at John Cochran on February 4, 2011. He reported feeling depressed and said his mother died on January 26, 2011. He was living in St. Joseph Center and was attending church with his daughter. He was still unemployed and requested another consult for the CWT program. On mental status exam, he had normal intelligence and was alert and oriented. He walked with a cane. His speech and thought processing were normal. His affect was depressed, and he described his mood as depressed. He denied any hallucinations or suicidal thoughts. His insight was partial and his judgment was poor. The dosage of venlafaxine (Effexor) was increased and the doctor encouraged him to abstain from alcohol for life. He was given a referral for the work rehab program. (Tr. 1179-1181).

The records of the SARRTP Aftercare Group indicate that Mr. Myers participated in group therapy and maintained his sobriety. The last record is dated March 2, 2011. (Tr. 1171).

4. **Consultative Examination**

Harry J. Deppe, Ph.D., performed a psychological consultative examination in

August, 2009. Mr. Myers told Dr. Deppe that he was seeking disability because "I've been in the hospital a few times because my girlfriend and I get into arguments and I get really upset." He said that he had last used alcohol and crack cocaine about 6 years ago. He lived with his girlfriend. He had 6 children, from 13 to 33 years of age. He had spent a month in jail about a year earlier for aggravated battery after an argument with his girlfriend. He had been hospitalized a few times because he became very upset after arguments with his girlfriend. Plaintiff said he was not under the care of a physician and was not taking any medications. His gait and posture were unremarkable. On exam, he had a full range of affect and his mood was normal. He was vague when speaking about his hospitalizations. His speech was clear and fluent. He had no formal thought disorders or delusional thought processes. He had no difficulty staying on task. He was oriented. His fund of general knowledge was good. His memory for recent and remote events was adequate. Immediate memory skills were good. His simple and abstract reasoning skills were good. Judgment and insight were good. He said that he last worked as a laborer in February, 2009, and "One day I just didn't show up for work because I was stressed about my girlfriend." He also said that he spent his time walking for exercise and doing household activities such as picking up around the house and washing dishes. Dr. Deppe concluded that plaintiff's ability to relate to others was fair, and his abilities to understand and follow simple instructions and to maintain attention required to perform simple, repetitive tasks were intact. His ability to withstand the stress associated with day-to-day work was fair to good. The diagnoses were polysubstance dependence, in remission, and major depression,

recurrent, in remission. (Tr. 365-369).

   6.   **RFC Assessment**

A state agency consultant assessed plaintiff's mental RFC in September, 2009. She opined that he was moderately limited in some areas of functioning, including ability to deal with detailed instructions and to maintain concentration and attention for extended periods. However, he was not significantly limited in most areas, including ability to remember locations and work-like procedures, to understand, remember and carry out short and simple instructions, to work in coordination with or proximity to others, to make simple work-related decisions, to maintain socially appropriate behavior, get along with co-workers, and to respond to changes in the workplace. (Tr. 384-386).

## Analysis

Plaintiff's first point is presented as a challenge to the determination of his RFC. Notably, there are no opinions from treating doctors. Therefore, the argument in plaintiff's brief regarding the weight to be given to the opinions of treating doctors is not relevant here. While plaintiff argues that additional limitations of using a cane, sleeping during the day, limited ability to walk, sit and stand, as well mental limitations, are supported by the medical records, this argument relies on a selective review of the records. Further, the records highlighted by plaintiff in his brief mainly reflect his own subjective statements to health care providers. Thus, his first point really amounts to an argument that the ALJ did not accept limitations that were established by his own statements. Therefore, both of plaintiff's points are directed to the ALJ's credibility

determination.

The Court must use an "extremely deferential" standard in reviewing an ALJ's credibility finding. *Bates v. Colvin*, __ F.3d __, **2013 WL 6228317, \*4 (7th Cir. 2013)**. The Court cannot reweigh the facts or reconsider the evidence, and can upset the ALJ's finding only if it is "patently wrong." *Ibid.* Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, **395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.** Contrary to plaintiff's suggestion, "an ALJ's credibility findings need not specify which statements were not credible." *Shideler v. Astrue*, **688 F.3d 306, 312 (7th Cir. 2012).**

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at \*3. While plaintiff's claims cannot be rejected *solely* because they are not supported by objective evidence, 20 C.F.R. §404.1529(c)(2), the ALJ may take that fact into consideration, since "discrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, **539 F.3d 473, 483 (7th Cir. 2008).**

Plaintiff correctly points out that ALJ Gaffaney used the boilerplate language that

has been criticized by the Seventh Circuit. See, **Bjornson v. Astrue, 671 F.3d 640, 644-645 (7th Cir. 2012), and cases cited therein.** This fact is not determinative of plaintiff's point. "[T]he simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Pepper v, Colvin,* **712 F.3d 351, 367-368 (7th Cir. 2013), and cases cited therein**. Here, the ALJ set forth a detailed discussion of plaintiff's credibility in light of the evidence.

ALJ Gaffaney gave specific reasons for his conclusion that plaintiff's allegations about both his physical and mental limitations were not credible. He pointed out that plaintiff initially claimed disability based only on his mental condition. It was only after his application was initially denied that he claimed physical limitations as well. With regard to his alleged depression, the ALJ noted that plaintiff's repeated hospitalizations all occurred while he was still abusing alcohol. After he became sober, he did not require inpatient treatment for his depression. The medical records from mental healthcare treatment in 2011, while he was sober, did not support his claim of debilitating depressive symptoms. Ruther, the ALJ noted that Mr. Myers expressed interest in participating in the work program offered by the VA, which contradicts his claim that he was unable to work due to his physical and mental condition. The ALJ noted that plaintiff told Dr. Deppe that he spent his time walking for exercise and doing household activities. This, of course, contradicted his claim that he was only able to walk half a block and spent much of the day sleeping or reclining. Dr. Deppe reported that his gait and posture were unremarkable in August, 2009. The ALJ noted that

plaintiff began using a cane in May, 2010, but medical records after that date documented normal physical examinations, including normal gait. Plaintiff told a healthcare provider in January, 2011, that his pain medication was helpful. Lastly, x-rays of plaintiff's spine, right knee and left hip did not support his claim of debilitating pain. In particular, an x-ray of his right knee from January, 2011, showed no fracture, dislocation, arthritic change or soft tissue swelling. (Tr. 15-17).

It is clear that the ALJ considered the relevant factors. Plaintiff does not take issue with any of the factors considered by the ALJ. He argues that the ALJ discredited his testimony based solely on a lack of support in the objective medical records. This argument borders on the frivolous because it ignores the many factors considered by the ALJ.

Plaintiff also suggests, in passing, that the ALJ should have obtained a consultative physical examination. However, he ignores the fact that an examination was scheduled, but he failed to attend. Plaintiff did not request that the exam be rescheduled. Also, it is notable that plaintiff did not inform the ALJ at the hearing that he had an appointment for an orthopedic consult at the VA the day after the hearing, and never submitted the record of that consult to the ALJ. "[A] claimant represented by counsel is presumed to have made his best case before the ALJ…." **Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2013), citing** Skinner v. Astrue, 478 F.3d 836, 842 (7th Cir. 2007).

The ALJ's credibility assessment need not be "flawless;" it passes muster as long as it is not "patently wrong." Simila v. Astrue, **573 F.3d 503, 517 (7th Cir. 2009).** ALJ Gaffaney's analysis is far from patently wrong. It is evident that he considered the

appropriate factors and built the required logical bridge from the evidence to his conclusions about plaintiff's testimony. *Castile v. Astrue*, **617 F.3d 923, 929 (7th Cir. 2010).**

In sum, plaintiff's argument on both his points is, in effect, nothing more than an invitation for the Court to reweigh the evidence. However, the reweighing of evidence goes far beyond the Court's role. Even if reasonable minds could differ as to whether Mr. Myers is disabled, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Shideler v. Astrue*, **688 F.3d 306, 310 (7th Cir. 2012)**; *Elder v. Astrue,* **529 F.3d 408, 413 (7th Cir. 2008).**

## Recommendation

After careful review of the record as a whole, the Court is convinced that ALJ Gaffaney committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the undersigned recommends that the final decision of the Commissioner of Social Security denying Craig J. Myers' application for disability benefits be **AFFIRMED** and that judgment be entered in favor of defendant.

Objections to this Report and Recommendation must be filed by **January 4, 2014**.

**Submitted:** December 18, 2013.

s/ Clifford J. Proud<br>
**CLIFFORD J. PROUD**<br>
**UNITED STATES MAGISTRATE JUDGE**